# EXHIBIT F



# McNeely Stephenson
ATTORNEYS

**JODY M. BUTTS**
317-825-5186
Jody.m.butts@msth.com

January 25, 2019

*Via E-mail*

Christopher C. Murray
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
Christopher.murray@ogletree.com

  Re:  Jaspreet Attariwala

Dear Mr. Murray:

  This letter is in response to your correspondence dated January 9, 2019, and January 18, 2019, regarding my client, Jaspreet Attariwala ("Jessie") and her former employment with BioConvergence LLC d/b/a Singota Solutions ("Singota").

## Singota's Allegations

  In response to your January 9 letter, Singota demanded that Jessie update her LinkedIn profile to make it clear that she is no longer associated with Singota.  While we are unaware of any legal violation regarding the same, upon receipt of your January 9 letter, Jessie changed her LinkedIn profile to reflect her change in employment.

  In your January 18 letter, Singota alleged that Jessie violated her Employment Agreement dated September 28, 2015 ("Employment Agreement") with Singota because she allegedly "solicited the business of Singota customers and prospects for the benefit of herself and potentially her new employer, Emergent Solutions."  Specifically, Singota states that Jessie:

> . . . began reaching out to Singota business contacts verbally and electronically while she was still employed by Singota and using Singota's Confidential Information to inform those contacts that she was going to Singota's competitor Emergent.  She informed Singota's business contacts that she would reach out to them in January on behalf of her new employer after she began her new position.

Additionally, in your January 18 letter, Singota expressed concerns that Jessie "is misusing her access to information concerning Singota's customers and prospects for [the Vanrx SA25 Aseptic Filling Workcell] ("SA25") (among Singota's other services) for her own benefit at her new employment."  This letter will address each of Singota's allegations/concerns, in turn, below.



Page No. 2
January 25, 2019

### *Jessie's Contact with Singota Contacts*

Singota has alleged that Jessie improperly reached out to Singota business contacts while she was still employed by Singota and attempted to solicit their business. Upon giving Singota her two weeks' notice, Jessie was provided a list of approximately forty (40) business contacts at Singota and was instructed by her supervisor to reach out to the contacts to notify them of her departure and introduce them to their new contact at Singota. Jessie did as instructed, copying her supervisor and other Singota employees on the emails to the business contacts. A handful of contacts asked Jessie about her future employment plans, and she responded to them that she would be working for Emergent. Jessie never directly or indirectly attempted to solicit business from these business contacts at any point in time. Furthermore, Jessie's Singota business contacts were in the area of clinical manufacturing while her new position at Emergent is in commercial manufacturing. As such, she would have no reason to attempt to solicit business from her Singota contacts because they would not be customers of Emergent. Based on the foregoing, Jessie was following her supervisor's express instructions when contacting Singota's business contacts, and, at no time, did she violate her Employment Agreement.

### *Jessie's Employment Agreement and Restrictive Covenant*

Jessie was employed with Singota as a Senior Business Development Manager pursuant to her Employment Agreement and Job Description Form. The Employment Agreement contains a restrictive covenant that, among other things, states that Jessie:

> . . . shall not directly or indirectly sell or otherwise provide or solicit the sale or provision of any product or service that competes directly or indirectly with any business of the company to any customer or prospective customer as to which, during the 12 months immediately preceding the date of termination, Employee (i) engaged in any solicitation, sales activity, or other direct contact (in person, in writing, by telephone or electronically) on behalf of the Company; (ii) performed any duties or services on behalf of the Company; and/or (iii) received any Confidential Information . . .

for twelve (12) months following the termination of the Employment Agreement ("Restrictive Covenant"). For the reasons set forth below, the Restrictive Covenant contains provisions that are overbroad, unreasonable, and unenforceable under Indiana law. Additionally, even assuming the Restrictive Covenant is enforceable, Jessie has not violated and will not be violating the Restrictive Covenant in her new position with Emergent.

Indiana courts have long held that covenants which restrict a person's employment opportunities are strongly disfavored. *See Dicen v. New Sesco, Inc.*, 839 N.E.2d 684, 687 (Ind. 2005). Non-competition agreements are strictly construed against the employer. *Cent. Ind. Podiatry, P.C. v. Krueger*, 882 N.E.2d 723, 729 (Ind. 2008). The Indiana Supreme Court has adopted a multi-part test to analyze a restrictive covenant's reasonableness. First, the employer must show that it has a legitimate interest to protect by way of the restrictive covenant. *Sharvelle*


*v. Magnante,* 836 N.E.2d 432, 436–37 (Ind. Ct. App. 2005). The employer also bears the burden of establishing that the restrictive covenant is reasonable in scope as to the time, activity, and geographic area restricted. *Id*. Time periods of two years or less have been held to be reasonable. *Coffman v. Olson & Co., P.C*., 906 N.E.2d 201 (Ind. Ct. App. 2009). For activity, while employers may permissively restrict employees from engaging in the same activities for competitors, blanket prohibitions on activity for any competitor in any capacity are unreasonable. *MacGill v. Reid*, 850 N.E.2d 926 (Ind. Ct. App. 2006). Specifically, such prohibitions are overbroad because they do not take into account the services actually performed by employees. *Id*. Finally, as to permissible geographic restrictions, courts have held that the reasonableness of a restriction depends on the interest of the employer that the restriction serves. *Slisz v. Munzenreider Corp*., 411 N.E.2d 700, 707–09 (Ind. Ct. App. 1980). Where the interest the employer seeks to protect is in sales, non-competition agreements must be limited to the area in which the employee had sales contacts. *Clark's Sales and Services, Inc. v. Smith,* 4 N.E.3d 772, 783 (Ind. Ct. App. 2014).

For purposes of this letter, we will assume that Singota will be able to show that it has a legitimate interest to protect and that the Restrictive Covenant's time period of one year is reasonable and valid. However, the Restrictive Covenant fails to meet the remaining factors because it is overbroad and unreasonable in its scope as to activity and geographic area. First, the restriction stating that Jessie "shall not directly or indirectly sell or otherwise provide or solicit the sale or provision of any product or service that competes directly or indirectly with any business of the company to any customer or prospective customer" is the functional equivalent of a blanket prohibition of serving as an employee in any capacity for any competitor, an approach which has been expressly rejected as unenforceable by the Indiana Supreme Court. *See MacGill*, 850 N.E.2d at 929. Also, the Indiana Court of Appeals has previously held that, while present customers are a protectable interest, a contract prohibiting contact with any past or prospective customers, no matter how much time has elapsed since their patronage ceased, was vague and too broad. *Seach v. Richards, Dieterle & Co.*, 439 N.E.2d 208, 214 (Ind. Ct. App. 1982). Thus, Singota's attempt to restrict sales to past and prospective customers is overly broad and unenforceable. Similarly, the provision attempting to limit the Restrictive Covenant only to competitors which Jessie formerly "engaged in any solicitation, sales activity, or other direct contact (in person, in writing, by telephone or electronically) on behalf of the Company" is overbroad because it includes services above and beyond those that Jessie actually provided to Singota, namely, sales. *Id*. Finally, the Restrictive Covenant does not have a geographic scope, which is unreasonable and overbroad. *See Krueger,* 882 N.E.2d at 730. Any geographic scope extending beyond an area of Jessie's actual sales' contacts is impermissible under Indiana law. *Krueger,* 882 N.E.2d at 730. Based on the foregoing, if the Restrictive Covenant is challenged in court, we strongly believe that the majority of the restrictions relating to scope of activity and geographic area will be deemed unenforceable under Indiana law.

*Jessie's Employment with Emergent*

Jessie has not started her employment with Emergent as a result of Singota's interference. When her employment does begin, Jessie understands that she will be working out of Emergent's Camden office in sales, with a commercial manufacturing clientele. Singota's clientele is strictly limited to clinical (small batch, i.e., 1,000 units) manufacturing as it has not been approved for

Case 1:21-cv-02163-JMS-DML   Document 1-9   Filed 08/02/21   Page 5 of 7 PageID #: 127



Page No. 4
January 25, 2019

commercial (large batch, i.e., 60,000 units) manufacturing. Additionally, Jessie's anticipated sales territory will be limited to California, an area that Jessie never serviced in her role at Singota. While employed by Singota, Jessie's sales territory was solely the East Coast. Finally, Jessie will be selling services that have been through a lyophilization process. Singota does not offer clinical or commercial lyophilization manufacturing services. Regarding the SA25, Jessie will not have any involvement with it at Emergent so this should not be a concern of Singota. Currently, Emergent's manufacturing of the SA25 is only occurring in Canada, which is well outside of Jessie's proposed sales territory, and it is for Emergent's internal manufacturing use only. Given the foregoing, even if the Restrictive Covenant was found to be valid and enforceable in its entirety (which we do not believe to be the case), Jessie's proposed employment position with Emergent does not violate the Restrictive Covenant.

### Jessie's Wage Claim

To date, we have not received a response to our January 2, 2019, letter regarding Singota's breach of the Employment Agreement because of its failure to pay Jessie's commissions. Instead, Singota has alleged that Jessie has violated certain provisions of her Employment Agreement, namely the non-competition provision. Indiana courts have long held that a party first guilty of a material breach of contract may not maintain an action against the other party or seek to enforce the contract against the other party should that party subsequently breach the contract. *Linocci v. Cardinal Assocs, Inc.*, 492 N.E.2d 48, 52 (Ind. Ct. App. 1986); *see also Lawrence v. Cain*, 245 N.E.2d 663 (Ind. Ct. App. 1969). This rule was discussed and applied in *Lawrence*, a case involving a lawsuit on a covenant not to compete. The *Lawrence* court held:

> [a]s a rule, a party first guilty of a substantial or material breach of contract cannot complain if the other party thereafter refuses to perform . . . where a contract is not performed the party is guilty of the first breach is generally the one upon whom rests all the liability for the nonperformance . . . . A party who has himself been guilty of the first substantial breach of contract cannot rescind the contract because of the subsequent refusal or failure by the other party to perform.

A party who fails to make payments as required by a contract is guilty of a breach thereof. *Brown v. Markland*, 53 N.E. 295 (Ind. Ct. App. 1899). In this case, Singota breached the Employment Agreement first when it failed to pay Jessie's commissions in October 2018. Jessie has not breached the Employment Agreement, despite Singota's allegations.

In Jessie's case, on the day she ended her employment at Singota, she was still owed her earned commissions for 2018 in the amount of $30,000. Pursuant to Indiana and federal law, Jessie should have received her wages, in full, within ten days after the conclusion of her employment. Singota's failure to promptly pay Jessie's final wages has exposed Singota to liability for treble damages in the amount of $90,000 (based on double the amount of wages due plus amount of wages due) if she pursues her wage claim against Singota. In our January 2nd letter, Jessie offered to settle this matter for $35,500, provided it was resolved prior to January 16, 2019. However, since settlement did not occur, Jessie has been unable to begin working at

en



Page No. 5
January 25, 2019

Emergent as a result of Singota's actions, and has incurred additional attorneys' fees. Accordingly, Jessie will now agree to settle this matter for $57,000, which consists of the following:

1. $30,000 in earned but unpaid commissions;

2. $5,000 in bonus;

3. $20,000 in additional damages as a result of Singota's bad faith and interference;

4. $2,000 for reimbursement of Jessie's attorneys' fees incurred to date; and

5. The parties will enter into a mutual release of all claims.

This offer has been made for the purpose of settlement negotiations only and shall not be used for any other purpose. Please send a check in the amount of $57,000 made payable to McNeely Stephenson and Jaspreet Attarriwala to the following address: 2150 Intelliplex Drive, Suite 100, Shelbyville, Indiana 46176, within seven days of the date of this letter, or on or before **Friday, February 1, 2019**. If we do not receive a response by that date, we will be forced to file a claim for wages and will be seeking all attorneys' fees, costs, and penalties associated with such claim.

## Litigation Hold

Finally, please be advised that this letter shall serve as a demand upon Singota to preserve any and all evidence related to Jessie's employment at Singota. In order to assure that Singota's obligation to preserve documents and things is met, please immediately forward a copy of this letter to all persons and entities with custodial responsibility for the items referred to in this letter.

The destruction, alteration, or loss of any of the below constitutes a spoliation of evidence. The list below provides examples of relevant evidence but is not an all-inclusive list of evidence that must be preserved. We specifically request that the following evidence be maintained and preserved and not be destroyed, modified, altered, or changed in any manner:

1. Personnel files, e-mails, texts, or other correspondence between Jessie and management or between others where Jessie is referenced directly or indirectly, employment application, performance appraisals, meeting notes, investigation reports, cover letters, payroll records, W-2s, job descriptions, contracts, and any other documents related to the foregoing.

2. All electronic documents and the storage media on which they reside which contain relevant, discoverable information beyond that which may be found in printed documents.

Further, this request encompasses the preservation of all documents, things, or data in Singota's possession or control that relate to the subject matter, including but not limited to the



Page No. 6
January 25, 2019

originals and drafts, copies or preliminary material which are different in any way from the final document. All categories of documents above include items stored in tangible, electronic, mechanical or other electronic form, including materials on computer tapes, disks, memory and backup copies, and deleted files on a computer or computer storage device or other media.

While it is common practice for businesses to periodically purge and/or destroy records, documents, things, and computer data, this letter serves as our request for Singota to undertake an affirmative obligation to advise its employees, affiliates, and agents immediately of all matters contained herein, so that all relevant documents, data, things, and materials relevant to this dispute are properly maintained and not concealed, destroyed, or altered in any fashion. Failure to do so may result in spoliation of evidence, as discussed below.

If Singota fails to properly secure and preserve these important pieces of evidence, this failure may give rise to the legal presumption that the evidence would have been harmful to Singota's side of the case. *See Cahoon v. Cummings*, 734 N.E.2d 535 (Ind. 2000). The rule applies not only to the destruction of evidence involved in pending lawsuits but also to instances "where the party spoliates evidence prior to the commencement of a lawsuit that the party knew or should have known was imminent." *Porter v. Irvin's Interstate Brick & Block Co.*, 691 N.E.2d 1363, 1364-65 (Ind. Ct. App. 1998). Additionally, the Indiana Supreme Court and, more recently the Court of Appeals of Indiana, have authorized courts to respond to discovery violations and spoliation of evidence with sanctions that may include ordering that designated facts be taken as established, prohibiting the introduction of evidence, dismissal of all or any part of an action, rendering a judgment by default against a disobedient party, and payment of reasonable expenses including attorneys' fees. *Howard Reg'l Health Sys. v. Gordon*, 926 N.E.2d 453 (Ind. Ct. App. 2010).

If you have any question regarding the scope of this request or any matters contained herein, please contact me so that we can discuss it further. Thank you for your anticipated cooperation.

Respectfully,

McNEELY STEPHENSON

*Jody M. Butts*

Jody M. Butts

cc: Jaspreet Attariwala, via email
Brooks Amriot, via email, Exhibit A only